# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

RICHARD HERSHEY

      Plaintiff,

vs.

CENTRAL TEXAS COLLEGE DISTRICT,

MARICELI SANTIAGO CRUZ, Director,
Student Life & Activities Office,
in her official and individual capacity,

OFFICER FABIAN TORRES, Badge # 8224
Police Officer, Central Texas College,
in his official and individual capacity,

OFFICER BRIANNE BASS, Badge # 1827
Police Officer, Central Texas College,
in her official and individual capacity,

OFFICER JOSEPH BARRIGAN, Badge # 2031
Police Chief, Central Texas College,
in his official and individual capacity,

REV. JIMMY TOWERS, SFC (RET),
CHARLES REX WEAVER, BRENDA
COLEY, ERNEST WILKERSON, BG (RET.),
ERIC R. ARMSTRONG, CHARLES J.
BRASHEAR, JR., and MARK MANNING, in
their official capacities as members of the
Central Texas College Board of Trustees,

      Defendants.

Case No. _____

**CIVIL RIGHTS ACTION FOR
DAMAGES AND
DECLARATORY AND
INJUNCTIVE RELIEF FOR
VIOLATIONS OF THE FIRST
AMENDMENT, 42 U.S.C.
§ 1983, AND THE TEXAS
CONSTITUTION**

## INTRODUCTION

1.      Richard "Rick" Hershey came to Central Texas College with a simple mission: to share his deeply held beliefs in a peaceful, respectful, and non-confrontational way. Joining the long tradition of influential pamphleteers like Thomas Payne, Rick gently appealed to compassion for animals and environmental stewardship via a plant-based diet.

2.      Rick stood on outdoor public walkways of Central Texas College's Killeen campus, offering literature to passersby, hoping to engage students and discuss his views.

3.      Rick did not shout, obstruct, or disrupt. He did not demand attention. He simply stood in the open air, exercising the rights enshrined in the First Amendment to the United States Constitution. Rights that are supposed to be most protected in traditional public fora like public college campuses, where ideas are meant to be exchanged freely.

4.      But Central Texas College chose to silence Rick. College officials, because of the content and viewpoint of Rick's message, called campus police to eject him. Without authority or justification, they falsely labeled the campus "private property," issued a criminal trespass warning, escorted Rick off campus, and banished him indefinitely under threat of arrest.

5.      Ironically, caretakers of an institution designed to foster learning and dialogue punished Rick for offering students a perspective rooted in ethics, compassion, non-violence, and the increasingly urgent need to care for the environment.

6.      This lawsuit seeks to vindicate Rick's rights and to ensure that no other person is silenced for peacefully sharing their beliefs on public college grounds, especially when their beliefs conflict with those of college officials.

## JURISDICTION & VENUE

7.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3)–(4), 1367(a), and 2201(a), because this action arises under the laws of the United States and violations of Plaintiff's constitutional rights.

8.    This Court has personal jurisdiction over the individual parties because all individual Defendants are residents of the state of Texas.

9.    Venue is proper in the Western District of Texas under 28 U.S.C. § 1391(b)(1)–(2) because all defendants are residents of Texas, and a substantial part of the events and omissions giving rise to the claim occurred in this district.

## PARTIES

10.    Plaintiff Rick Hershey is a senior citizen of the United States and a resident of the state of Missouri.

11.    Defendant Central Texas College District (hereinafter, the "College" or "CTCD") is a public junior college with its main campus in Killeen, Texas. CTCD has other campuses in Lampasas, Marble Falls, Gatesville, and Fredericksburg, Texas, and elsewhere, including several other U.S. states.

12.    Defendant Director Mariceli Santiago Cruz is the Director of Student Life & Activities for CTCD's Killeen campus and at all relevant times acted under color of law in the course and scope of her duties as a duly appointed and acting policymaker, officer, servant, employee, and agent of the College. Director Cruz is named herein in her official and individual capacity.

13.    Defendant Fabian Torres, Badge No. 8224, was at all relevant times employed as a Police Officer on the Killeen campus and was acting under color of state law in the course and scope of his duties as a Police Officer of the College. Officer Torres is named herein in his official and individual capacity.

14.    Defendant Officer Brianne Bass, Badge No. 1827, was at all relevant times employed as a Police Officer on the Killeen campus and was acting under color of state law in the course and scope of her duties as a Police Officer of the College. Officer Bass is named herein in her official and individual capacity.

15.    Defendant Police Officer Joseph Barragan, Badge No. 2031, was at all relevant times employed as Police Chief on the Killeen campus and was acting under color of state law in the course and scope of his duties as Police Officer of the College. Chief Barragan is named herein in his official and individual capacity.

16.    Defendants Rev. Jimmy Towers, Sfc (Ret), Charles Rex Weaver, Brenda Coley, Ernest Wilkerson, Bg (Ret.), Eric R. Armstrong, Charles J. Brashear, Jr., and Mark Manning are current members of the College Board of Trustees (collectively, "Trustees") and act under color of law in the course and scope of their duties as duly appointed and acting policymakers, officers, servants, employees, and agents of the College. Defendant Trustees are named herein solely in their official capacities.

## STATEMENT OF FACTS

### Rick's May 2, 2024 Ejection & Banishment for
### Distribution of Non-Commercial Literature

17.    Rick is a vegan advocate whose ethical beliefs compel him to share his

message. He does so by distributing free, non-commercial literature, for which he is compensated by various nonprofit advocacy organizations.

18.    On May 2, 2024, Rick was lawfully on the outdoor public walkways on the Killeen campus of the College (the "Campus") for the purpose of peaceably distributing free, non-commercial, educational booklets in support of Rick's strongly held vegan beliefs.

19.    Rick was distributing his literature outdoors to interested passersby in the courtyard south of the Roy J. Smith Student Center, a public common area, while enjoying his cherished right to free expression without any interference.

20.    To reach more students, Rick then moved to the courtyard between the Anderson Campus Center and the Student Center, known as the Middle Mall area.

21.    The Middle Mall area is a centrally located outdoor grass and concrete courtyard with some benches, tables and chairs, and walkways where people engage in speech, sit down to visit, and pass through on their way to other parts of campus.

22.    At no time on May 2, 2024, while Rick was on the Campus to distribute literature, did he ever: use amplified sound, raise his voice, or otherwise create any disturbance; interfere with pedestrian or other traffic; violate any law; disrupt the functioning of the College; obstruct any entrances to buildings; or obstruct or disrupt any College operations whatsoever.

23.    If anyone declined Rick's offer of a booklet, Rick did not pursue it.

24.    Rick's leafleting activity was entirely peaceable and non-aggressive in all respects and was designed only to share information concerning plant-based diets,

non-violence, and animal-agriculture-induced environmental harms with those who were interested in receiving the information.

25.     The College, including the Anderson Campus Center and Roy J. Smith Student Center, was open for business during the entire time Rick was present on Campus.

26.     The College was open to the public, including members of the public not affiliated with CTCD, and the Campus is not gated.

27.     Rick peaceably distributed his literature to interested passersby outdoors without incident for about thirty minutes while exercising his right of free expression.

28.     Rick never did any outreach indoors at the College.

29.     Upon information and belief, a student or other member of the Campus community to whom Rick had handed a pamphlet brought it to Director Cruz.

30.     Director Cruz reviewed the pamphlet's content and its viewpoint.

31.     After Rick had been leafletting for about thirty minutes, Director Cruz approached Rick with the pamphlet and told him that he could not distribute literature unless he went to Campus police headquarters, filled out a request form, and relocated to a location of the College's choosing.

32.     Rick explained to Director Cruz that he didn't need to do so because that would be a violation of the Texas Protected Expression on Campus Education Code ("Texas Speech Code") which defined the entire outdoor campus as a traditional public forum. Tex. Educ. Code § 51.9315(c)(1).[1]

---

[1] Section 51.9315 was amended effective Sept. 1, 2025, but references to this statute throughout the complaint refer to the version in effect at the time. That version provided

33.   Rick asserted his right to remain and continue to peaceably distribute his literature on the College outdoor public common areas of his own choosing.

34.   In response, Director Cruz, in arbitrary fashion called, the College police to the scene, chilling Rick's protected speech and retaliating against him based on his invocation of his federal and state law speech rights, vegan identity, and the content and viewpoint of the pamphlet, all in violation of the clearly established protections of the First Amendment to the United States Constitution and the Texas Speech Code.

35.   Defendant Police Officer Fabian Torres responded to Director Cruz's call.

36.   Director Cruz furnished CTCD police with a copy of Rick's literature.

37.   Officer Torres approached Rick in the Middle Mall courtyard and told him he could not hand out his literature because the College was "private property."

38.   Rick explained to Officer Torres that the College is public property and that the First Amendment and Texas Speech Code protected his right to hand out his booklets outdoors on the Campus.

---

that "An institution of higher education shall . . . permit any person to engage in expressive activities in [the common outdoor areas] of the institution's campus freely, as long as the person's conduct: (A) is not unlawful; and (B) does not materially and substantially disrupt the functioning of the institution." Tex. Educ. Code § 51.9315(c)(1)−(2) (West 2019). The comparable provision in section 51.9315 as recently amended applies only to "students enrolled at and employees of the institution." Tex. Educ. Code Ann. § 51.9315(c) (West 2025). The amended provision does not apply retroactively under Texas law because it contains no express language to that effect. *See Houston Indep. Sch. Dist. v. Houston Chron. Pub. Co.*, 798 S.W.2d 580, 585 (Tex. App.−Houston [1st Dist.] 1990), writ denied (noting that "Texas law militates strongly against the retroactive application of laws" and requiring express language to infer retroactivity) (citing Tex. Const. art. I, § 16 and Tex. Gov't Code § 311.022).

39.    Officer Torres insisted that the College is "private property," and "is not a public entity," repeatedly stating variations of the College being "private," "private property," "private to you," and "publicly known as private" numerous times.

40.    During his interaction with College police, Rick was entirely peaceable.

41.    Rick explained to Officer Torres that it was Torres's responsibility to enforce the law and not to violate the law.

42.    Torres replied that his job was to enforce College policy.

43.    Officer Torres then called Defendant Police Officer Bass and requested a criminal trespass warning in order to chill Rick from exercising his cherished First Amendment-protected right to free expression at the College not only on that day, but also in the future.

44.    Defendant Officer Bass responded to Officer Torres' call and approached Rick in the outdoor Middle Mall where Torres was interfering with Rick's leafletting activities.

45.    Officer Bass advised Rick at least two times that the College was "private property."

46.    The fact that both Officers Torres and Bass repeatedly and falsely told Rick that the College was private demonstrates that the College and Defendant Police Chief Joseph Barragan provided no training whatsoever with respect to the First Amendment rights of speakers on public outdoor areas on public college campuses like the College's.

47.    Specifically, the College and Chief Barragan completely failed to train College police officers, including Officers Torres and Bass, that the College is a public

college and its outdoor common areas are public property that serve as traditional public fora under Texas law and the First Amendment and on which speakers engaged in expressive activity enjoy maximum protections.

48.    Moreover, it appears that the College and Chief Barragan affirmatively instructed College police officers to advise individuals that the College was private property in order to facilitate removing them from Campus.

49.    The need for training on the application of the First Amendment to speech rights on the Campus was obvious because college campuses are a frequent venue for speakers of all kinds, and College police officers are exclusively assigned to the Campus.

50.    Moreover, upon information and belief, outside speakers have engaged in First Amendment-protected expressive activities in Campus outdoor common areas both before and after May 2, 2024.

51.    To chill Rick from exercising his cherished First Amendment rights at the College on that day and in the future, Officer Bass issued Rick a Criminal Trespass Warning for peaceably distributing his non-commercial literature that banished Rick from the College indefinitely under threat of arrest. *See* Criminal Warning, Exhibit 1.

52.    Officer Torres then ejected Rick from Campus, escorted him to his vehicle, and made note of the license plate number on Rick's vehicle and his vehicle description in order to chill Rick from exercising his First Amendment rights at the College on that day and in the future.

53.    As they parted, Rick again told Torres that his job was to enforce the law, and Torres once again replied that his job was to enforce policy.

54.    Officers Torres and Bass each filed narratives summarizing their ejection and banishment of Rick from the Campus, and in the report, Bass included a PDF copy of Rick's non-commercial literature that she reviewed for its viewpoint. *See* Offense/Incident Report, attached as Exhibit 2, and Food and Nonviolence Pamphlet, attached as Exhibit 3.

55.    At all relevant times, Police Chief Barragan directly supervised Officers Torres and Bass and their unlawful actions against Rick.

56.    Police Chief Barragan reviewed the police report, including his two officers' narratives, the Criminal Trespass Warning, and the copy of Rick's non-commercial literature. To chill Rick from future exercise of his First Amendment rights at the College, Chief Barragan approved the police report, including a copy of the literature and the Criminal Trespass Warning, based upon CTCD practices and policy, the content and viewpoint of Rick's literature, and Rick's identity as a vegan. *See id*.

57.    Because he feared arrest, Rick vacated the Campus even though he knew that his ejection from Campus and indefinite banishment via the Criminal Trespass Warning was unlawful and the outdoor Campus area in which he was leafletting was a traditional public forum.

58.    Rick's ejection from Campus and indefinite banishment on pain of arrest significantly shortened the time he had intended to spend on Campus and left him unable to distribute most of his literature that he had planned to hand out.

59.    Because he feared and continues to fear arrest, Rick has not returned to the Killeen Campus as he had otherwise planned, specifically including but not limited to May 3 and 6, 2024.

60.    Because he feared and continues to fear arrest, Rick has not gone to any of the College's other central Texas campuses as he had otherwise planned, including Marble Falls, Lampasas, Gatesville, and Fredericksburg campuses on but not limited to May 7, 8, 9, and 10, 2024.

61.    After CTCD police completed its report about its interaction with Rick, Rick requested a copy of the report. CTCD initially refused to produce the report to Rick as required by the Texas Public Information Act, Chapter 552 of the Government Code. CTCD eventually provided it only after Rick submitted multiple written requests and the deadline imposed by the Act had run.

**CTCD's Unconstitutional Policies**

62.    The locations where Rick was distributing his literature are defined by Texas law as a traditional public forum. Tex. Educ. Code § 51.9315(c)(1).

63.    The College, pursuant to section 51.9315(b)(1), adopted a policy governing the use of College facilities for protected expressive activities that was incorporated into the publicly available 2023−24 student handbook then in effect and applied to and enforced against Rick.[2] Page 47, in the paragraph titled "Free Speech, Peaceful & Expressive Activity," stated as follows:

> To support and protect expressive activities including the free expression of ideas and to petition and assemble in a peaceful manner on Central Texas College District ("CTCD" or "College") campuses. Policy No. 185 Free Speech, Peaceful Assembly & Expressive Activity applies to all CTCD employees, students, visitors and guests at all CTCD Campuses in Texas. All

---

[2]https://web.archive.org/web/20231013181113/https://www.ctcd.edu/sites/ctcd/assets/File /Student%20Life/student-handbook.pdf.

requests for peaceful assembly or expressive activity shall be submitted to the CTCD Police Department on CTCD's application for peaceful assembly. Adherence to the requirements set forth in this policy and all CTCD Safety Policies found at https://www.ctcfacstaff.ctcd.edu/faculty-staff/risk-management/safety-manual-policy-andprocedures/ (nonworking link).

64.    Rick was unable to find the College's free speech policy online when he looked for it prior to his visit to the College, especially because it was buried and hiding behind broken internet links.

65.    The operative language of this policy remains in effect and is published in the student handbook for the current academic year.[3]

66.    The College's full Free Speech, Peaceful & Expressive Activity policy is also now separately published on the College website (although it requires navigating through multiple pages to locate) and provides in relevant part:

> The public may not enter CTCD campuses for the purpose of advocacy, information distribution, or speech activity without prior College approval.
>
> . . .
>
> [and]
>
> . . .
>
> [O]nly notice by submission of CTCD's application for peaceful assembly to the CTCD Police or Site Director is required for members of the College community to assemble or distribute written material, and no permit or prior approval is needed.[4]

---

[3]    *See*   https://www.ctcd.edu/sites/ctcd/assets/File/Student%20Life/student-handbook.pdf (p. 47).

[4] https://www.ctcd.edu/sites/ctcd/assets/File/Risk%20Management/policies/safety-policy-185.pdf.

67.    CTCD has an additional unconstitutional policy applied to and enforced against Rick.[5] It is titled "Unauthorized Persons; Refusal of Entry, Ejection, Identification," and states as follows:

> The governing board of a state institution of higher education or its authorized representatives, campus police and/or administrators, may refuse to allow persons having no legitimate business to enter on property under the board's control and may eject any undesirable person from the property on his refusal to leave peaceably on request. Identification may be required of any person on the property.

68.    This policy encourages and emboldens College officials to arbitrarily and capriciously deem people engaging in peaceable expression like Rick as "undesirable" and utilize standardless discretion to eject such "undesirables" whenever the officials oppose the viewpoint of the speaker's protected speech.

69.    Finally, CTCD has a Security and Access policy pursuant to which its officers may accost non-campus-affiliated individuals, demand to know their reason for being on College property, and eject them if they deem the provided reason insufficient.[6] There are no standards to guide officers' discretion in such cases and, as evidenced by their ejection of Rick despite his invocation of his First Amendment right to continue leafletting, no exceptions for individuals engaged in First Amendment-protected expressive activity.

> All faculty, staff and students of Central Texas College (CTC) are required to obtain a current college identification card and have this card in their possession while on CTC property. As a security precaution, Campus Police

---

[5] https://www.ctcd.edu/locations/central-campus/campus-safety-wellness/safety-and-security/campus-police1/campus-rules-regulations-and-policies/trespassing/.

[6] https://www.ctcd.edu/locations/central-campus/campus-safety-wellness/safety-and-security/campus-police1/campus-rules-regulations-and-policies/security-and-access/.

may request anyone at anytime while on CTC property to show their identification card. Anyone requested by Campus Police to show an identification card but who cannot produce one and believes they have a legitimate reason for being on CTC property, will be asked by Campus Police to explain these reasons. If Campus Police determine that any such explanations are insufficient they reserve the right to request the person leave the premises.

70.    The College imposed these aforementioned unlawful policies upon Rick.

71.    These policies applied to and enforced against Rick violate the First Amendment and the Texas Speech Code then in effect, as follows:

a.    They require individuals, such as Rick, to obtain written permission of the police to use outdoor grounds for protected expressive activities, and thus violate Rick's rights under the First Amendment and the Texas Speech Code by:

   i.    Imposing a prior restraint requiring permission and giving unfettered discretion to a government official to determine whether to allow speech on the Campus grounds. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 n.19 (1993);

   ii.    Failing to comply with First Amendment requirement that any time, place, and manner restriction include clear, published, content- and viewpoint-neutral criteria; provide alternative means of expression; and serve a significant institutional interest;

   iii.    Failing to comply with the Texas Speech Code's requirement that any time, place, and manner restriction provide that an institution of higher education shall: (1) ensure that the common outdoor areas of

the institution's campus are deemed traditional public forums; and (2) permit any person to engage in expressive activities in those areas of the institution's campus freely, as long as the person's conduct: (a) is not unlawful; and (b) does not materially and substantially disrupt the functioning of the institution. Tex. Educ. Code §§ 51.9315(c)(1) and (2)(A)(B);

    iv.    Failing to comply with the Texas Speech Code's directive "recognizing freedom of speech and assembly as central to the mission of institutions of higher education." Tex. Educ. Code § 51.9315(b)(1);

    v.    Imposing an excessively long advance application submission period for a sole leafleteer, requiring that "expressive activities event requests are to be submitted to the CTCD Police Department at least seven (7) calendar days in advance of the event";

    vi.    Failing to comply with the Texas Speech Code by not making the entire Policy available online. Tex. Educ. Code § 51.9315(i)(3);

    vii.    Having a nonoperating link to the Policy online.[7] Tex. Educ. Code § 51.9315(i)(3);

    viii.    Restricting more speech than necessary to achieve a compelling

---

[7] https://www.ctcfacstaff.ctcd.edu/faculty-staff/risk-management/safety-manual-policy-and-procedures/

government interest;

ix.     Restricting more speech than necessary to achieve a significant government interest;

x.      Restricting more speech than necessary to achieve a reasonable government interest;

xi.     Allowing arbitrary and capricious enforcement;

xii.    Basing enforcement upon content and viewpoint discrimination;

xiii.   Basing enforcement upon the identity of the speaker;

xiv.    Not narrowly tailoring restrictions to achieve a compelling, significant, or legitimate government interest;

xv.     Prohibiting spontaneous expression;

xvi.    Providing no alternate means for expression; and

xvii.   Imposing a prior restraint that requires the speaker to indemnify the College, even against acts of negligence of others.

b.  These policies discriminate against non-Campus-affiliated speakers like Rick by forcing them to obtain written permission of the police to use outdoor grounds for protected expressive activities while only requiring Campus-affiliated speakers (such as students, faculty, and staff) to provide notice but not obtain permission to engage in the same conduct, and by allowing non-Campus-affiliated speakers to engage in speech only if a Campus police officer subjectively deems their speech-based rationale to be a legitimate reason to be on Campus.

c.    They provide that members of the general public, such as Rick, who are peaceably on College property to exercise their First Amendment rights but without having received specific permission or authorization, may be ejected and banished from the College. The provision as applied to and enforced against Rick thus violates his rights under the First Amendment by:

   i.    Granting unfettered discretion to individual officers or other unnamed persons to impose punishment on Rick and others for exercising their protected rights under the First Amendment and the Texas Speech Code by ejecting and banishing them, which encourages and emboldens College employees to engage in the type of conduct perpetrated against Rick when he attempted to exercise his rights protected under the First Amendment and the Texas Speech Code on May 2, 2024;

   ii.    Prohibiting, or severely restricting, the access of Rick and other non-College-affiliated individuals to a traditional public forum;

   iii.    Permitting the College to relegate Rick to a specific limited location of its own choosing within a traditional public forum;

   iv.    Imposing any permit requirement whatsoever. The Texas Speech Code allows college-affiliated-individuals to distribute written material without a permit or other permission from the institution, Tex. Educ. Code § 51.9315(d)(4), and the First Amendment restricts speaker-based discrimination;

v.       Maintaining and enforcing the Policy after the effective date of the Texas Speech Code, September 1, 2019, Defendants CCTD, Director Cruz, Officer Torres, Officer Bass, Chief Barragan, and the Board of Trustees violated and continue to violate the First Amendment and the Texas Speech Code, causing an ongoing chilling of Rick's speech;

vi.      Not providing Rick alternate means of expression;

vii.     Denying Rick access to a traditional public forum for the reason of the Campus being "private property" and at the absolute standardless discretion of College officials who oppose the viewpoint of his literature, Defendants acted arbitrarily and capriciously and in retaliation for Rick's protected speech and its content and viewpoint, and Rick's identity as a vegan; and

viii.    Ejecting and permanently banishing Rick from the College and thereby inflicting ongoing punishment on him for peaceably handing out his literature without first asking him to leave as required by the College's trespassing policy.

## <u>COUNT I</u>
**First Amendment Violation – Freedom of Speech**
**42 U.S.C. § 1983**

72.    Rick incorporates the preceding paragraphs as though stated here.

73.    Rick peaceably distributes his free non-commercial literature on university and college campuses, for which distribution he is compensated by various nonprofit advocacy organizations.

74.     Rick desires, and has desired since May 2, 2024, to resume distributing non-commercial literature on all campuses of the College without prior restraint, without interference from College officials, and without ejection, banishment, and threat of arrest by College police.

75.     Rick has standing to challenge College policy because the College applied its unlawful policy to him in order to chill his expression.

76.     Because Rick has distributed and intends to continue distributing literature on the College campuses, he has been and will continue to be affected by the aforementioned College policies that unlawfully restrict his right to free expression protected under the First Amendment to the United States Constitution and the Texas Speech Code, effective September 1, 2019, he has standing to challenge those regulations enforced against him.

77.     The term "traditional public forum" in the Texas Expression on Campus Education Code derives its meaning from opinions of the United States Supreme Court. In a "traditional public forum," the public has the greatest freedom of expression, and the government is permitted only to impose content-neutral time, place, and manner restrictions that serve a significant government interest, are narrowly tailored to advance that interest, and leave open ample alternative channels of communication. *McCullen v. Coakley*, 573 U.S. 464, 477 (2014).

78.    "Expressive activities" means any speech or expressive conduct protected by the First Amendment to the United States Constitution or by article I, section 8 of the Texas Constitution, and includes the distribution of written material. Under the Texas Speech Code, the term does not include commercial speech. Tex. Educ. Code § 51.9315(a)(2).

79.    "It is the policy of [Texas] and the purpose of this section to protect the expressive rights of persons guaranteed by the constitutions of the United States and of this state by recognizing freedom of speech and assembly as central to the mission of institutions of higher education." Tex. Educ. Code § 51.9315(b)(1).

80.    "Institutions of higher education" includes any public junior college or public state college. Tex. Educ. Code § 61.003(2).

81.    The College's regulations violate the First Amendment and the Texas Speech Code facially and as applied to Rick, as set forth in detail in Paragraph 71(a)–(c).

82.    Rick had a right protected by the First Amendment to the United States Constitution to distribute literature on the sidewalks, courtyards, and malls on the outdoor common grounds of the College, a traditional public forum as defined by Texas law. Tex. Educ. Code § 51.9315(c)(1).

83.    As a proximate cause of the actions taken by Defendants CTCD, Director Cruz, Officer Torres, Officer Bass, Chief Barragan, and the Board of Trustees, Rick was denied his right of expression under the First Amendment to the United States Constitution and the Texas Speech Code as set forth in detail in Paragraph 71(a)–(c).

84.    Rick has been, and remains, chilled from exercising his First Amendment rights on all CTCD campuses as result of the experiences and CTCD policies and practices enforced against him set forth herein.

85.    Rick challenges the CTCD policies both on their face and as applied to him.

86.    Defendants' actions were in violation of Rick's clearly established constitutional rights as set forth in detail in Paragraph 71(a)−(c).

87.    As a direct and proximate result of Defendants' violations of his constitutional rights, Rick has suffered, and will continue to suffer, irreparable harm as a result of Defendants' interference with his First Amendment rights.

88.    Additionally, as a direct and proximate cause of Defendants' actions, Rick suffered the following harms, for which he seeks monetary relief: lost wages, psychological injuries, embarrassment, distress, humiliation, anger, frustration, standing in the community, criminal penalties, travel, lodging, meal expenses, costs, including interest, and attorney fees.

89.    It was clearly established law that Rick had a First Amendment right to engage in protected speech—peaceably distributing his non-commercial literature to interested passersby—on the outdoor common areas of the Campus—a traditional public forum.

90.    It was and is obvious that ejecting and permanently banning a peaceable, nondisruptive leafleteer like Rick from a traditional public forum on pain of arrest violates his First Amendment rights.

91.     Defendants Cruz, Torres, Bass, and Barragan should have known that free speech on a traditional public forum is established law.

92.     Thus, Defendants Cruz, Torres, Bass, and Barragan are not entitled to qualified immunity for their interference with Rick's exercise of his First Amendment rights.

93.     Furthermore, Rick is entitled to (1) declaratory judgment that the CTCD policies alleged in this Complaint are unconstitutional because they violate the First Amendment; and (2) an injunction against defendants from enforcing their unconstitutional policies against Rick and other similarly situated individuals who come onto the College's campuses to engage in protected speech activity.

## COUNT II
### Free Speech Violations under Texas Constitution
### Article 1, Section 8

94.     Rick incorporates the preceding paragraphs as though stated here.

95.     Article 1, section 8 of the Texas Constitution guarantees that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."

96.     Additionally, the Texas Speech Code in effect at the time of the events at issue herein ensured that all common outdoor areas of an institution's campus are deemed traditional public forums, meaning that free speech rights cannot be violated or restricted in those areas.

97.    Rick was in such an outdoor, traditional public forum when Director Cruz and the police officer defendants confronted him.

98.    While government entities are allowed to place reasonable restrictions on the time, place, and manner of speech in traditional public fora, those restrictions must be narrowly tailored to serve a significant government interest, be content-neutral, and provide ample alternative means of expression. *McCullen*, 573 U.S. at 477.

99.    CTCD's policies place unreasonable restrictions on the time, place, and manner of speech in traditional public fora by requiring would-be speakers to apply for permission to speak and jump through cumbersome administrative hoops, imposing standardless and arbitrary review processes, and ultimately, restricting speech without significant government interests.

100.    Texas courts allow suits for equitable remedies when constitutional rights are violated. *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995) (holding that suits seeking "compensation or money damages" for violations of constitutional rights are not allowed, but "[s]uits for equitable remedies for violation of constitutional rights are not prohibited.").

101.    CTCD's policies facially and as applied to Rick violate Texas' Free Speech clause because it placed and continues to place unreasonable restrictions on the time, place, and manner of his speech—under threat of criminal penalties—without a significant government interest, and without leaving ample alternative means of expression.

102.    Rick, therefore, is entitled to a declaratory judgment that the CTCD policies described herein are unconstitutional under the Texas Constitution both facially and as

applied to him, and that the Criminal Trespass Warning issued to him by the police officers and the College is therefore invalid and improperly imposed on him.

103.    Rick is also entitled to an injunction to prevent the College from enforcing these unconstitutional policies against him and infringing on his Free Speech rights, as well as attorneys' fees.

## COUNT III
### Failure to Train
### 42 U.S.C. § 1983

104.    Rick incorporates the preceding paragraphs as though stated here.

105.    At all relevant times, Defendant Police Chief Joseph Barragan was responsible for the training and supervision of Campus police officers, including defendants Torres and Bass.

106.    Chief Barragan acted under color of state law and had final policymaking authority regarding officer training and enforcement of college policies.

107.    The College and Chief Barragan had a duty to ensure that Campus police officers were adequately trained in constitutional requirements governing speech on public college campuses, including the First Amendment and Texas Speech Code.

108.    This duty included training officers, *inter alia*, that:

a.    The College is a public college;

b.    Outdoor common areas of public college campuses are traditional public fora under Texas law and the First Amendment;

c.    Individuals have the right to engage in peaceful expressive activities in those areas without prior restraints, permit requirements, or viewpoint

discrimination; and

    d.  Enforcement of college policy must comply with constitutional standards and cannot override clearly established law.

109.  Chief Barragan failed to provide adequate training on these constitutional requirements, despite the obvious need for such training given:

    a.  The College's adoption of policies restricting expressive activity;

    b.  The high likelihood that Campus police would encounter individuals exercising First Amendment rights; and

    c.  The clearly established law protecting speech in traditional public fora.

110.  Indeed, upon information and belief and as may be inferred by the actions of Officers Torres and Bass, the College and Chief Barragan did not provide *any* training whatsoever on how the First Amendment applies to the public college grounds.

111.  Because college campuses are a frequent venue for speakers of all sorts, outside speakers have, upon information and belief, engaged in speech on the Campus, and College police officers are exclusively assigned to the Campus and its environs, it was predictable and obvious that the College and Chief Barragan's failure to train would result in violations of the First Amendment rights of speakers such as Rick.

112.  Had Officers Torres and Bass received adequate training on how the First Amendment applies to the Campus, they would not have acted as they did toward Rick.

113.  This complete lack of training is sufficient to show that the College and Chief Barragan acted with deliberate indifference to the rights of persons with whom the officers would come into contact, including Rick.

114.    It results in an environment in which there is an obvious potential that another individual attempting to lawfully speak to students on the Campus would likewise be deprived of his or her First Amendment rights.

115.    While providing no training whatsoever as to the constitutional duty at issue is alone sufficient to establish failure-to-train liability on the part of the supervisor or employer, a pattern of constitutional violations is also present here.

116.    Such a pattern could not be more clear where two separate officers independently told Rick numerous times that the traditional public fora of a public college—where First Amendment rights are at their greatest—were not subject to First Amendment protections, but were instead "private property."

117.    This shows that whatever training Officers Torres and Bass received not only lacked what it was constitutionally required to include—instructions as to on-campus speakers' First Amendment rights—but instructed officers to falsely represent that the Campus was private property on which those speakers had limited First Amendment rights.

118.    As a direct and proximate cause of this complete lack of constitutionally required training, and pursuant to affirmatively unconstitutional instructions, Officers Torres and Bass enforced unconstitutional policies, misrepresented the Campus as "private property" on at least ten occasions between the two of them, issued a criminal trespass warning, and banished Rick indefinitely from Campus, thereby violating his clearly established First Amendment rights.

119.    The failure to train was a moving force and a substantial cause of the constitutional violations suffered by Rick.

120.    Plaintiff is entitled to damages, declaratory relief, and injunctive relief against the College and Police Chief Barragan in his official and individual capacities for this failure to train.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Richard Hershey respectfully prays that the Court grant the following relief:

A.    A judgment against the College and all Defendants named in their individual capacities for monetary damages in an amount to be proven at trial.

B.    A judgment against the College and all Defendants named in their individual capacities for punitive damages in an amount to be proven at trial.

C.    A judgment against all Defendants for nominal damages for violating Rick's constitutional rights.

D.    A declaratory judgment that the challenged CTCD policies are unconstitutional facially and as applied to Rick under 28 U.S.C. §§ 2201−2202 and under the implied cause of action under Texas state law for equitable relief.

E.    A declaratory judgment that the Criminal Trespass Warning issued to Rick is unconstitutional and void.

F.    A declaratory judgment that the College's designation of the traditional public fora of its Campus as "private property" for purposes of restricting speech is unlawful.

G.    A preliminary and permanent injunction prohibiting Defendants and their agents, officials, servants, officers, employees, and persons acting in concert with them,

from enforcing the challenged CTCD policies against Rick at the College and all other CTCD campuses.

H.    A preliminary and permanent injunction prohibiting Defendants and their agents, officials, servants, officers, employees, and persons acting in concert with them, from designating those outdoor areas of the College that First Amendment jurisprudence holds to be traditional public fora as "private property" for purposes of restricting speech or representing the same to Rick or anyone similarly situated.

I.    An award of attorney's fees and costs under 42 U.S.C. § 1988.

J.    Such other and further relief as the Court may deem just and proper.

Dated: December 31, 2025             Respectfully submitted,

                                    */s/ Dallin B. Holt*
                                    **DALLIN B. HOLT**
                                    Texas State Bar No. 24099466
                                    HOLTZMAN VOGEL BARAN
                                    TORCHINSKY & JOSEFIAK PLLC
                                    2555 E. Camelback Road, Suite 700
                                    Phoenix, AZ 85016
                                    dholt@holtzmanvogel.com
                                    (602) 388-1262

                                    **ANDY O. WILSON***
                                    HOLTZMAN VOGEL BARAN
                                    TORCHINSKY & JOSEFIAK PLLC
                                    1221 Broadway, Ste. 2100
                                    Nashville, TN 37203
                                    awilson@holtzmanvogel.com
                                    (615) 981-1041

                                    *Counsel for Plaintiff Richard Hershey*

                                    *\* Pro Hac Vice Forthcoming*